UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ROSE M. COOK, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    3:06-CV-00362AS |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM, ORDER & OPINION**

Plaintiff, Rose M. Cook ("Ms. Cook"), seeks judicial review of the denial of her claim for benefits and a period of disability under Title II of the Social Security Act. The Commissioner of Social Security found Ms. Cook entitled to neither a period of disability nor Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416 (I), 423. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Ms. Cook applied for DIB on April 12, 2002 (Tr. 72-74). This initial application was denied and the decision was not appealed (Tr. 23-26). On or about August 5, 2003, Ms. Cook applied once again for DIB alleging an onset disability date of May 1, 2002 (Tr. 68-71). This claim was denied on October 28, 2003 and the request for reconsideration was denied on March 23, 2004 (Tr. 27-31, 33-35). Ms. Cook then requested a hearing in front of the Administrative Law Judge ("ALJ"), Joseph Scholass, which was conducted on December 8, 2005 (Tr. 38, 380-421). After the ALJ denied Ms. Cook's application, she

requested review by the appeals council, which was denied on April 14, 2006 (Tr. 3-6).

## I. Background

Statement of Facts

At the time of the ALJ's decision, Ms. Cook was fifty-eight years old, she had a ninth grade education, and had completed vocational training to become a nurse's assistant (Tr. 384-386).  Previously, Ms. Cook had worked as a nurse's assistant, a bartender and short order cook, a hog trimmer, and a machine operator (Tr. 386-387, 122-126).

Medical Evidence

Throughout the period in which she is claiming disability, Ms. Cook has an extensive medical history and has been seen by numerous physicians, including personal physicians, emergency room staff, and those physicians who evaluated her pursuant to her disability claim.

First, on September 13, 2001, Ms. Cook saw her primary care physician, Dr. Kevin O'Brien, M.D., complaining of neck pain (Tr. 253).  Dr. O'Brien noted that Ms. Cook was unable to work from September 14, 2001 through September 16, 2001, but could return to work after that date without restrictions. Id.

A few months later, on January 23, 2002, Ms. Cook returned to Dr. O'Brien complaining of headaches, nosebleeds, pain in her right arm, associated swelling, and palpitations (Tr. 245). Dr. O'Brien noted lymphedema, focal tenderness in the right axillary area, absent breasts, and a removed pectoralis muscle on the right. Id.  After ordering a chest

2

X-ray and treadmill test, Dr. O'Brien diagnosed chest pain, musculoskeletal pain, and elevated blood pressure. Id.  Also, Dr. O'Brien gave Ms. Cook samples of Toprol XL, recommended that she take Aspirin once a day, and reported that she was unable to return to work for the time being (Tr. 252).

On March 7, 2002, Ms. Cook returned to Dr. O'Brien complaining of severe pain and left anterior rib contusion after reporting that she slipped and fell at work (Tr. 180).  Dr. O'Brien diagnosed severe rib pain status post-contusion, splinted the tender area with tape, proscribed Vicodin, and advised Ms. Cook to stay off of work until March 18. Id.

On May 16, 2002, a few weeks after her alleged onset date of May 1, 2002, Dr. O'Brien drafted a letter stating that Ms. Cook had been in his care for ten years and detailing her health problems (Tr. 179).  Specifically, Dr. O'Brien stated that Ms. Cook was status post-mastectomy of her right breast in July, 1998, and had: (1) had a left elective mastectomy of her right breast in February, 1999, (2) chest pains after her normal heart catheterization in 1991, (3) had carpal tunnel surgery in 1983, (4) a depressed ejection fraction of thirty-three percent and a low mycardial output state, (5) a history of gastritis, and (6) hypertension. Id. Overall, Dr. O'Brien noted:

> Taken together, she has been having more and more trouble and (*sic*) unable to do regular work.  She may indeed be looking at the need for disability in the future or at the present.  She may benefit from a functional evaluation.  Rose is not a complainer and has stayed very busy despite the above medical problems. Id.

On June 29, 2002, at the request of the Social Security Administration, Dr. Navjot

3

Singh, M.D. examined Ms. Cook (Tr. 176-178). At the consultation, Ms. Cook gave a history of breast cancer status-post bilateral mastectomy and chemotherapy with continued fatigue, difficulty lifting or carrying out household activities, and migraines (Tr. 176). During the examination, Dr. Singh observed that Ms. Cook: had a normal gait, was able to stand on her heels and toes, was able to squat, had a normal range of motion throughout, had weakness in the upper extremities at 4/5th strength, had full strength in the lower extremities, had normal reflexes, had fine finger manipulation, and had normal grip strength (Tr. 177-178). Finally, Dr. Singh diagnosed breast cancer status-post bilateral mastectomy and chemotherapy, a history of bilateral arm weakness and a currently stable history of migraines, and recommended that Ms. Cook be evaluated by a physical medicine and rehabilitative specialist (Tr. 177).

A few months later, on August 27, 2002, Ms. Cook went to Logansport Memorial Hospital with complaints of chest pain which she described as, "vague, subtle, left-sided chest pain" (Tr. 343). The attending physician noted Ms. Cook's medical history of breast cancer and a normal heart catheterization in 1997. Id. After ordering a cardio work-up, which came back normal, the attending physician diagnosed chest wall pain and advised Ms. Cook to follow up with Dr. O'Brien (Tr. 344).

On September 9, 2002, Ms. Cook saw Dr. Edward T.A. Fry, M.D. complaining of chest and arm discomfort upon exertion (Tr. 229-232). Dr. Fry found Ms. Cook's symptoms compatable with unstable angina with several risk factors, cardiomyopathy, and Class III

4

symptoms of congestive heart failure (Tr. 231). Dr. Fry then recommended a right and left heart catheterization, instructed her to continue taking aspirin, and gave her samples of Toprol XL, a medication for angina, hypertension, and heart failure (Tr. 232).

The next day, on September 10, 2002, Ms. Cook had a chest x-ray showing minor cardiomegaly, or enlargement of the heart (Tr. 208, Taber's Cyclopedic Medical Dictionary, 329 (19th ed., 2001)).

The same day, Ms. Cook saw Dr. Tony K. Nasser, M.D. complaining of unspecified chest pain upon exertion (Tr. 189-193). Dr. Nasser ordered a right and left heart catheterization for the following day and advised Ms. Cook to stop smoking and continue an aspirin regime (Tr. 192-193). The next day, on September 11, 2003, Ms. Cook's heart catheterization showed normal coronary arteries and mildly reduced LV function with an overall ejection fraction of fifty percent (Tr. 220-222).

On September 16, 2002, Ms. Cook returned to Dr. O'Brien complaining of recurrent chest pains and occasional palpitations (Tr. 206). Dr. O'Brien confirmed Ms. Cook's normal heart catheterization on September 11, 2002, diagnosed pleuritic chest pain, hypertension, and a history of mild cardiomyopathy, and proscribed Zoloft due to severe psychosocial stressors. Id.

On October 1, 2002, Dr. O'Brien drafted a letter noting that Ms. Cook: (1) suffered from a complex variant of chest pain, (2) had cardiomyopathy with an ejection fraction of thirty-three percent, and (3) suffered from chronic anxiety (Tr. 205). Dr. O'Brien further

5

noted that, "[a]s far as disability, this is really hard to comment on, but I do believe she has had multiple severe health problems that are really greatly limiting on her ability to [do] multiple things, and she cannot carry out normal activities." Id.

Later in October 2002, Ms. Cook's medical record was reviewed by Dr. J.V. Corcoran, M.D., who stated that he thought Ms. Cook retained the capacity to perform medium level work despite her history of mild congestive heart failure, ejection fraction of more than fifty percent, normal cardiac catheterization results, and minor cardiomegaly (Tr. 256-257).

On April 29, 2003, Dr. O'Brien drafted a third letter in which he noted Ms. Cook's multiple medical problems including: severe chronic osteoarthritis, cardiomyopathy, carpal tunnel surgery, a history of heart catheterizations, and an ejection fraction that had improved from its low of thirty-three percent in 1998 (Tr. 278).

The same day Dr. O'Brien completed a multiple impairments questionnaire at the request of Ms. Cook's attorney in which Dr. O'Brien indicated that he treated Ms. Cook every four to six months for hypertension, osteoarthritis, and a history of breast cancer, and stated that her prognosis was fair to good (Tr. 279-285). Specifically, Dr. O'Brien estimated that Ms. Cook's pain level was mild ("3" on a scale of 1-10) and her fatigue level was moderate ("6" on a scale of 1-10). Id. Further, Dr. O'Brien concluded that Ms. Cook would be able to sit four hours in an eight hour workday with five minute breaks every hour, and stand/walk two hours in an eight hour workday (Tr. 281). Finally, Dr. O'Brien opined that

6

Ms. Cook's pain, fatigue, and other symptoms were frequently severe enough to interfere with attention and concentration (Tr. 284).

On May 20, 2003, Dr. Fry filled out the same questionnaire, indicating that he saw Ms. Cook intermittently depending on her status and stated that her prognosis was good (Tr. 286-291). Specifically, Dr. Fry concluded that Ms. Cook was able to sit for one hour in an eight hour workday, stand/walk for one hour in an eight hour workday, and occasionally lift or carry fifty pounds (Tr. 288-289). Finally, Dr. Fry estimated that Ms. Cook would likely be absent from work two to three times per month and that she was incapable of even low stress work due to the daily stress that contributed to the severity of her conditions. Id.

On September 14, 2003, Dr. B. Whitley, M.D., reviewed Ms. Cook's record and concurred with Dr. Corcoran's October, 2002 assessment that Ms. Cook was able to perform medium level work (Tr. 294, 300).

On October 28, 2003, Dr. Fry completed the same assessment he had filled out in May, the only change being that he checked off that Ms. Cook should never carry or lift weight (Tr. 321-325).

On March 1, 2004, Dr. Phillip S. Budzenski, M.D., evaluated Ms. Cook at the request of the Social Security Administration (Tr. 301-308). Ms. Cook reported that she was seeking disability due to arthritis, chest pain, history of carpal tunnel syndrome, and cancer (Tr. 301). Further, Ms. Cook complained of chest pain and shortness of breath and reported her medications as Zoloft, Nitroglycerin, Protonix, Hyzaar, Aspirin, and Dizaepam (Tr. 301-302).

7

Upon examination Dr. Budzenski found that Ms. Cook: (1) had a normal gait and could get on and off the examination table without difficulty, (2) could walk on her toes, heels, and in tandem, and squat without difficulty, (3) had normal flexion and extension of the back and neck, (4) had normal straight leg testing, (5) had normal range of motion throughout except for a minor reduction in her right shoulder, (6) had normal grip strength, and (7) had normal motor strength except that her right shoulder was slightly reduced at 4/5 strength (Tr. 303-307).

Further, Dr. Budzenski found Ms. Cook to be non-complaint with medical recommendations due to her history of GERD, tobacco use, and hypertension control (Tr. 305). Finally, Dr. Budzenski opined that Ms. Cook would be able to work eight hours a day in a seated, standing, or ambulatory position, that she had full use of her lower extremities, full use of her upper left arm for grasping, pushing, pulling, and manipulating five pounds continuously and ten pounds occasionally, and full use of her upper right arm for fine-fingered manipulation and simple grasping of two to five pounds (Tr. 306).

In March, 2004, the same month as Dr. Budzenski's assessment of Ms. Cook, the state's reviewing physician, Dr. L. Batnagel, M.D., reviewed Ms. Cook's record and opined that she could perform light work (Tr. 309-317).

On April 6, 2004, Ms. Cook returned to Dr. O'Brien complaining of significant and recurring headaches, fatigue, back pain, chest pain, and chronic axillary pain after her mastectomy (Tr. 319). Ms. Cook further stated that she had difficulty doing anything on a

8

longstanding basis and that she had quit smoking, although Dr. O'Brien did not believe the latter statement. Id.  Dr. O'Brien noted that Ms. Cook had chronic tenderness in the right axilla and some osteoarthritis of her hands and stated, "[b]ecause of all of her multiple above medical problems and based on her global problems, she will have difficulty finding and working full time on any meaningful type of employment for the foreseeable future." Id.

On June 16, 2004, Dr. O'Brien drafted a fourth letter in which he noted that Ms. Cook's medical history consisted of: recurrent severe chest pains, a normal heart catheterization in 2002, variant angina, cardiomyopathy with a depressed ejection fraction of unknown etiology, infiltrating ductal carcinoma of the right breast status-post removal in July, 1998, an elective left mastectomy in 1999, carpal tunnel syndrome with severe hand pain, generalized osteoarthritis, and severe gastritis. (Tr 327).  Further, Dr. O'Brien opined that Ms. Cook was unable to work an eight hour day or lift things above twenty pounds and that he expected this to last throughout the remainder of her lifetime. Id.

One month later, on July 16, 2004 Dr. O'Brien completed another multiple impairments questionnaire in which he gave Ms. Cook a fair prognosis and described her muscle and joint pain as constant (Tr. 328-329). Specifically, Dr. O'Brien rated Ms. Cook's pain as moderate (4-6 on a scale of 1-10) and her fatigue and moderate to moderately severe (6-8 on a scale of 1-10) (Tr. 330).  Further, Dr. O'Brien stated that Ms. Cook was able to sit 4-5 hours with breaks every 30-40 minutes  and stand or walk 1-2 hours in an 8 hour workday. Id.  Additionally, Dr. O'Brien found that Ms. Cook was moderately limited in

grasping, turning and twisting objects and markedly limited in reaching overhead, although she could occasionally life up to twenty pounds and carry up to ten pounds (Tr. 331-332). Finally, Dr. O'Brien noted that Ms. Cook would be absent from work more than three times per month on average (Tr. 334).

On September 9, 2004, Ms. Cook saw one of Dr. Fry's colleagues Dr. Ronald Razmi, M.D., reporting an episode of chest pain (Tr. 371). Dr. Razmi indicated that Ms. Cook had no history of coronary artery disease, had a borderline LV function at fifty percent, and was a chronic smoker who continued to smoke. Id. Dr. Razmi ordered a stress cardiolite test and a follow up with Dr. Fry. Id.

Finally, on October 29, 2004, Ms. Cook saw Dr. O'Brien for a follow-up regarding her congestive heart failure (Tr. 363). After Ms. Cook admitted to continued smoking, Dr. O'Brien examined her, noting decreased breath sounds and a prolonged expiratory phase. Id. Dr. O'Brien diagnosed lymphadentis and prescribed Omnicef. Id.

Hearing Testimony

On October 19, 2005 a hearing was held in which Ms. Cook, Dr. Joseph King, M.D., and Stephanie Archer, a vocational expert, testified.

Ms. Cook testified that she had stopped working due to swelling under the arms, severe chest pain, and headaches (Tr. 388). Specifically, Ms. Cook complained of: continuous swelling in her right arm that was exacerbated by lifting, weekly chest pain that sometimes traveled down her right arm to her elbow that she was able to control with

10

Nitroglycerin or avoiding activity for 10-15 minutes, shortness of breath, inability to sleep due to aching legs and frequent trips to the bathroom, and the need to take frequent naps throughout the day (Tr. 389-402).

Additionally, Ms. Cook testified about her abilities to perform household activities. She stated that she could: lift a gallon of milk if she used both hands, stand for 10-15 minutes at a time, walk around the house and take her dog for a walk, walk on a treadmill once a month, do the laundry, try to dust and cook, occasionally make the beds, vacuum over the span of three days, and drive to the doctor or nursing home to visit her mother (Tr. 394-401). However, Ms. Cook also testified that she was unable to mop or sweep her home and her husband accompanied her to do major shopping (Tr. 398). Finally, Ms. Cook testified that she smoked a pack of cigarettes and drank a pot of decaffeinated coffee a day (Tr. 405-406).

The same day, Dr. King testified that Ms. Cook did not have any impairment which would be of listing level security and that he thought her ejection fraction of fifty percent was good (Tr. 409-412).

Finally, vocational expert Stephanie Archer testified that someone of Ms. Cook's demographic with her listed impairments (including either an individual who was limited to lifting 25 pounds frequently and 50 pounds occasionally, standing, walking, or sitting 6 hours a day and only occasionally reaching, or an individual who was limited to lifting 10 pounds frequently and 20 pounds occasionally, pushing, pulling, and reaching occasionally, and who had to avoid concentrated exposure to extreme heat or cold) could work as a bartender and

11

short order cook while an individual with only the latter impairments could work as a general office clerk (Tr. 415-417).

ALJ's Decision

On December 8, 2005 the ALJ issued its findings that despite Ms. Cook's controlled hypertension, mild congestive heart failure, nicotine dependance, breast cancer status post bilateral mastectomy, and chemotherapy, she was nonetheless able to perform a restricted range of light level work, such as her previous work as a bartender and short order cook (Tr. 12-19).  Accordingly, based upon the application filed on May 19, 2003, the ALJ found that Ms. Cook is not entitled to a period of disability or disability insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act. Id.

## II. Standard of Review

This court's review of the Commissioner's decision is a limited one.  Unless there is an error of law, this court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. Shoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 399-400 (1971). In making a substantial evidence determination, this court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. Williams v. Apfel, 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the

12

result." Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000).

### III. Discussion

Generally, "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." Estok v. Apfel, 152 F.3d 636, 638 (7th.Cir.1998). Specifically, the claimant bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. Reading v. Matthews, 542 F.2d 993, 997 (7th Cir.1976) (citing, Jeralds, 445 F.2d at 38-39). Furthermore, the claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The regulations supporting the Social Security Act create a five-step inquiry in determining whether a claimant is disabled, under which the ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy.

Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520). The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. Bolinger v. Barnhart, 446 F. Supp. 2d at 955 (N.D.Ind., 2006).

13

**A. The Treating Physician Rule**

Ms. Cook raises three arguments in response to the ALJ's decision.  First, Ms. Cook argues that the ALJ erred in failing to give controlling weight to Ms. Cook's physicians.

Generally, a treating physician's opinion will be given controlling weight by the ALJ so long as the opinions are "well supported by medically acceptable clinical and laboratory techniques and are not inconsistent with other substantial medical evidence in the record." 20 C.F.R. § 404.1527 (d)(2); Zurawski v. Halter, 245 F.3d 881, 889 (7th Cir. 2001). However, in instances in which the treating physician's opinion is not well supported by medical evidence or is inconsistent with other evidence, the ALJ is entitled to credit the opinion of a consulting physician over the claimant's treating physician.  *See e.g.,* Reynolds v. Bowen, 844 F.2d 451, 455 (7th Cir. 1988) ("[W]hile the treating physician's opinion is important, it is not the final word on a claimant's disability").  Moreover, the ALJ's reliance upon the opinion of a state physician constitutes substantial evidence that the claimant's medical condition did not meet or equal a listed impairment. Scheck v. Barnhart, 357 F.3d 697 (7th Cir. 2004).

Further, "[a]n ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." 20 C.F.R. § 404.1527 (c)(3).  Yet, an ALJ does not always have the duty to seek additional information from a physician. Instead, courts must generally respect the ALJ's reasoned judgment as to how much evidence to gather. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993).

14

In the instant case, the ALJ stated that Dr. O'Brien's assessment of Ms. Cook's condition was not entitled to significant weight because of an "absence of supporting medical evidence, and the consistency of the contrary medical assessments of record." (Tr. 18). Additionally, the ALJ did not give Dr. Fry's opinion significant weight (Tr. 19). Ms. Cook now argues that the ALJ "substituted his own opinion" against the opinions of Doctors O'Brien and Fry (Plaintiff's Br. at 18). However, the ALJ clearly stated that part of his reason for rejecting Dr. O'Brien's opinion was the "consistency of contrary medical assessments" (Tr. 18). Those contrary medical opinions include the doctors who examined Ms. Cook on behalf of the Social Security Administration, Dr. Navjot Singh, and Dr. Phillip S. Budzenski, as well as the doctors who reviewed her file, including Dr. J.V. Corcoran, Dr. B. Whitley, and the doctor who testified at her hearing, Dr. King, none of whom assessed Ms. Cook's medical problems as rising to the level of a listed impairment (Tr. 176-178, 301-308, 256-257, 294-300, 409-412). Thus, the ALJ properly relied upon other substantial medical evidence in the record, not his own medical judgment, in denying Ms. Cook's application for disability.

Further, Ms. Cook argues that the ALJ erred in failing to clarify inconsistencies in Dr. Fry's medical assessments contained in the record (Plaintiff's Br. at 17). However, an ALJ does not always have to clarify inconsistencies in the record, particularly when there is sufficient evidence in the record to make an assessment notwithstanding the inconsistencies. Indeed, in Ms. Cook's case the ALJ had the opportunity to review the records, testimony, and

15

opinions of as many as ten physicians. Thus, the ALJ's decision was based not on inconsistencies in Dr. Fry's records, but instead was based on the "consistency of contrary medical assessments" regarding Ms. Cook's condition (Tr. 18). Therefore the ALJ did not err in failing to give Dr. Fry's opinion controlling weight.

Moreover, Ms. Cook's argument that the ALJ erred in failing to give controlling weight to the opinions of Doctors O'Brien and Fry is flawed because the majority of the medical evidence in the record does not support her claim. For example, following her alleged onset date of May 1, 2002, the record contains 4 instances of Ms. Cook's alleged disabilities being tested by medically acceptable clinical and laboratory techniques, each of which revealed results consistent with the ALJ's finding Ms. Cook to be capable of performing a restricted range of light level work, including the following: (1) testing done on June 29, 2002, by Dr. Singh revealing normal results with the exception of weakness in Ms. Cook's upper extremities at 4/5th strength; (2) a normal cardio work-up on August 27, 2002; (3) a September 11, 2003, heart catheterization showing normal coronary arteries and mildly reduced LV function; and (4) a series of tests performed by Dr. Budzenski on March 1, 2004 producing normal results except for minor reduction in the range of motion and motor strength in Ms. Cook's right shoulder. (Tr. 178-178, 343-344, 220-222, 303-307).

Thus, because the opinions of Doctors O'Brien and Fry were not well supported by medically acceptable clinical and laboratory techniques and were inconsistent with other opinions in the record, there is no substantial evidence that the ALJ erred in failing to follow

the treating physician rule.

## B. The Testimony of the Vocational Expert

Secondly, Ms. Cook argues that the ALJ relied upon flawed testimony from the vocational expert because the ALJ did not allow the expert to respond to a hypothetical that matched Dr. O'Brien's recommendations (Pl. Br. at 19). Generally, hypothetical questions posed to vocational experts must reflect all limitations supported by medical evidence in the record. Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).

However, there seems to be no difference between Dr. O'Brien's recommendations regarding lifting and the hypothetical posed to the vocational expert. Dr. O'Brien's latest opinion in the record, an evaluation he filled out on July 16, 2004 found that Ms. Cook could occasionally lift up to twenty pounds and carry up to ten pounds (Tr. 331-332). This is the exact same limitation that was contained in the hypothetical posed to the vocational expert (Tr. 415-416). Accordingly, there is no substantial evidence that the hypothetical the ALJ posed to the vocational expert was flawed.

## C. Credibility Determination

Finally, Ms. Cook argues that the ALJ erred in discounting her credibility (Pl. Br. at 20). Generally, credibility determinations by the ALJ are entitled to "special deference" and will only be overturned if the determination is patently wrong. Schenk v. Barnhart, 357 F.3d 697, 703 (7th Cir., 2004); Powers v. Apfel, 207 F.3d 431,435 (7th Cir. 2000). Further, a discrepancy between the degree of pain claimed by a Social Security disability applicant and

that suggested by medical records is probative of exaggeration. Sienkiewicz v. Barnhart, 409 F.3d 798 (7th Cir. 2005). Finally, the ALJ does not have to specifically provide an evidentiary basis for the credibility determination so long as the record supports the determination. Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).

Here, the ALJ found Ms. Cook's statements concerning the intensity, duration, and limiting effect of her symptoms were not entirely credible due to inconsistencies in the record failing to support the severe fatigue and headaches about which Ms. Cook testified (Tr. 18). Indeed, of the numerous physicians who treated Ms. Cook, there is no evidence that any of them treated her for headaches. In fact, Dr. Singh noted that while Ms. Cook had a history of migraines, they were currently stable (Tr. 177). Further, the record reveals no instances in which Ms. Cook was treated for fatigue. Instead on April 29, 2003, Dr. O'Brien mentioned Ms. Cook's fatigue but he rated it as moderate, and on July 16, 2004, he rated it as moderate to moderately severe (Tr. 279-285, 330). Such evidence does not support Ms. Cook's statements regarding the severity of her headaches and fatigue. Accordingly, because Ms. Cook's statements are not supported by medical evidence in the record, and the ALJ's credibility determination was not patently wrong, there is no substantial evidence that the ALJ erred in discounting Ms. Cook's credibility.

## IV. Conclusion

The purpose of this Court's review of the ALJ's decision is to ensure that it is supported by substantial evidence. Therefore, since the ALJ's decision was supported by

18

substantial evidence, the decision of the Commissioner is **AFFIRMED**.

**SO ORDERED**.


**Date: June 12, 2007**　　　　　　　　　　　　　　　　　　S/ ALLEN SHARP
　　　　　　　　　　　　　　　　　　　　　　　　　**ALLEN SHARP, JUDGE**
　　　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT COURT**